# CRIMINAL COURT OF BALTIMORE CITY.

Filed December 20, 1921.

IN THE MATTER OF GEORGE E. HITCHCOCK.

*Robert F. Leach, Jr.,* State's Attorney, for State of Maryland.

*Daniel S. Sullivan* and *E. Milton Altfeld* for defendant.

DUFFY, J.—

This is an application by the State's Attorney to have a juror disciplined for violation of his duty as a juror. In June last a charge by indictment for robbery against Bert Bell and four others came on for trial before me and a jury.

The trial proceeded in due course, and, after lasting several days, ended in the acquittal of all the traversers. The jurors were permitted to separate at the adjournment of court and also at recess each day, with the usual instruction not to discuss the pending case with anyone.

After the termination of the trial the State's Attorney's petition was filed against George E. Hitchcock, one of the jurors. An answer was duly filed by the contemnor. Testimony has been taken and argument of counsel has been heard.

Sergeant McManus was a witness in the robbery case, called by the State. He attended the trial daily. He had a copy of the written statement made to the detectives by Fisher, one of the traversers. Some time during the trial he boarded a car and was reading Fisher's statement. The juror Hitchcock sat down beside him. According to the testimony of these two men, they were not acquainted with each other. They both state that Hitchcock asked McManus if he was going to receive any of the reward for the conviction of the defendants in the bank robbery case, that McManus said he knew nothing of such reward, and that they must not talk about the case. That McManus asked Hitchcock what he did and was informed that he was a plasterer; whereupon McManus said he would like to have him make an estimate on a wall of his house, but not to come up to his house to look at it until after the pending trial had been terminated. That Hitchcock did go to McManus' house after the trial and was told by McManus that he had not the money at that time to have the work done. McManus said that Hitchcock did not read Fisher's statement then in the officer's hand, and Hitchcock says he saw a paper in the Sergeant's hand, but did not know what it was and did not read it. This is substantially all that occurred between these two men on the car according to their statements. This same copy of the statement of Conrad Fisher in the hands of Sergeant McManus came to the attention of Juror August Buttner during the trial of the case. Buttner's testimony on this point is as follows:

"A. Well, he is on our beat in the 400 block on Pratt Street. Our place is at 410, and, of course, I have known Sergeant McManus long before this case ever came up to be tried. In fact, he had often come into our store and occasionally he would buy a ham or a piece of meat and we were altogether on right friendly terms. Now, I think that on this particular morning he came in there to fix up some of his papers. Here (indicating) was my desk and here was a window and he

stood about there, and I remember he made some remark about some automobile numbers that he wanted to look up. I didn't pay a great deal of attention to just what he did say, but I know that there were some papers laid out by him on the board and I happened to notice one that had a blue paper outside cover, and, if I am not mistaken on that, it was done in green typewriting. It was in green ink and it had on the back of it, 'The Statement of Conrad Fisher.' I said, '*Why, I think that we were all looking for that paper in court this morning.*' And *that was all that was said, because following that he put it in his pocket again;* but that was what was on the back cover of the paper. *And that is really what gave me the doubt in my mind. I had settled on 'not guilty' at first, but that really strengthened my verdict of acquittal.*

"Q. Well, what did he come in your place for?

"A. Why, he would come in there and order things from me——

"Q. No, on this particular occasion?

"A. On this occasion?

"Q. Yes?

"A. Why, nothing especially, only to straighten up his papers as I understood it. He would often come in there, every morning and sometimes as often as twice in one day.

"Q. Now, do I understand you to say that Sergeant McManus pulled this paper out of his pocket?

"A. Yes, sir. He pulled this particular paper out of his pocket along with several other papers and then he laid them on the board.

"Q. Did you see any of the writing on any of them?

"A. No, sir. Only on the cover of this one paper.

"Q. Only on this one?

"A. That was all; yes, sir. I don't know what was on the inside of the paper, but what I have already told you was what was on the cover. I remember it had a light blue cover.

"Q. And what was it you saw on the cover?

"A. The statement of Conrad Fisher.

"Q. What did he say to you about it?

"A. *He said nothing whatever. He picked it up almost immediately and* *then put it right back in his pocket again.* He did that when I had called his attention to the fact that they were looking for that paper. *I can't think now which morning of the trial it was, but I know that it was the morning that we were looking for that paper here and it was lost. I remember that. We had been looking for it, but nobody could find it.*

"Q. Now, did you mean to say that that was all that occurred between you and Sergeant McManus?

"A. Yes, sir; that was all." * * *

Bearing in mind what has been stated above, let us come to what some of the jurors say transpired in the jury room after the jury had retired to consider their verdict. During the debate among the jurors, Hitchcock states to his colleagues:

According to Juror Voltz:

That he, Hitchcock, went to McManus' house or McManus went to his house and McManus said: "Don't say anything about this because it might cost me my job (page 16). If anybody says anything, say you came to the house to cement a walk or plaster a wall or something of that sort" (page 17). That Sergeant McManus told him that he had the statement of Fisher or Daniels in his pocket (page 20).

According to Juror Jarboe:

Hitchcock said that it was a frameup on the part of the police; that he, Hitchcock, had every reason to believe that these men were not guilty. That he had had a conversation with Sergeant McManus either at his house or McManus' house regarding this case, and McManus came out and made a statement to him, "For God's sake, don't convict these men, it was blood money" (page 57).

Hitchcock further stated that there was a reward of nine hundred dollars that was to be divided between the officers in the Police Department that secured the 'arrest of the traversers (page 57).

"Q. And what time did you bring in the verdict?

"A. It seems to me it was after 10 o'clock. It was pretty late—that night between 10 and 11 o'clock, to the best of my knowledge. I think we had taken one ballot before we went to dinner and two afterwards. On the second ballot I think we stood eight to four

for acquittal. Four of us were still out on the second ballot. And then after that there was this discussion of this frame-up and the Police Department, about these people being paid, and some of the money to convict these men to be distributed among the Police Department. And Mr. Buttner made a statement which impressed me, along with what Mr. Hitchcock had to say about it, and I decided that I would vote—that my decision—Mr. Voltz, after this information came out, you see, Mr. Voltz turned around and said, 'Well, Mr. Foreman, if that is the case, if that is the case, these men must be innocent and suppose we make it an acquittal.'

"Q. That is what Mr. Voltz said?

"A. That is what Mr. Voltz said to me.

"Q. Did Mr. Voltz say that to you privately or did he say it in the open, so that all the jurors could hear it?

"A. In the open; all could hear it.

"Q. How long after Voltz said that was the last ballot?

"A. Then immediately we took the ballot. That was before the bailiff came down to inquire if we were going to give a verdict, just previous to that time, and we told him, 'In a very few minutes we will be through.' And on the strength of that we took the ballot and we voted them all innocent."

According to Juror Dunn:

Hitchcock said that he thought the case was a frame-up on the police and detectives' part (p. 84).

That he did not think it was bank robbers—might have been bootleggers, but he did not think they were bank robbers (p. 86).

That he had seen a signed statement—signed by the Fisher boy (p. 92).

That there was to be a reward of between $900 and $1,000 to the prosecution—if convicted (p. 93).

That other jurors made this same statement about the reward—Hitchcock did most of the talking in regard to the matter, but whether he remarked about that before any of the others, Dunn could not say (p. 99).

That it was blood money and that he had been told this by the police department (p. 94).

The important parts of Juror Keen's testimony are contained in the following extracts from the record (p. 110 et seq. and 126 et seq.):

"Q. Now, after the jury retired to the jury room, tell the Court what was said and done by Hitchcock as indicating possession of any information by him that had not been brought out in the evidence.

"A. I think after the ballot had been taken several times, finally the Judge sent down, or, just previous to the Judge sending down and asking could we give a verdict within a certain time, otherwise he would be going home, Hitchcock made a remark about a frame-up. Somebody asked the question, 'What do you mean by a frame-up?' 'Well,' he said, 'the police department is trying to frame these boys.' Somebody asked, 'Well, what would be the benefit of framing these boys? The crime was committed—no doubt about that—somebody committed the crime; what would be the benefit or the interest to the police department to let the guilty ones go free and convict the innocent ones?' He said, 'Well, it is because they have heard things against them, I suppose; possibly they might be bootleggers, or they have done other things they want to get them for.' He said, 'Well, I don't think that is a fair way to handle it.' Somebody asked, 'What would cause you to think that?' That is the way, as I recall, it went along. He said, 'Well, as a matter of fact, while I was going out on the street car—I don't recall the line—but I was going out on the street car and I sat down in the seat with a police officer, and I think it was Sergeant McManus, and *he showed me a paper that he had in his pocket—said it was Fisher's statement, that had not been used in evidence.*' I or somebody asked Hitchcock, what was the policeman doing with this statement; that Fisher had made his statement on the stand; what benefit would that be to a policeman. And I said, 'It was not Fisher's statement that was missing.' I said, 'It was Bell's statement, as near as I can remember, that had been read and then mislaid.' He said, '*No, positively* it was Fisher's statement and I saw it.' That was just before the Judge sent down. I said, 'Well, did anyone else see his statement and know it was Fisher's statement?' And a man said, 'Yes, I saw it; Sergeant McManus has it in his pocket at this time.'

"Q. Who said that?

"A. Buttner.

"Q. The seventh man on the jury—his name was Buttner?

"A. Buttner. He said, "Sergeant Mc-Manus has that statement in his pocket.' 'Well,' I said, 'that is pretty bad—if the State is handling the case like that—that is pretty bad.'

"Q. Following that, didn't you say, or someone else in the conversation then express doubt as to that having taken place at all, and didn't Hitchcock then say, 'Yes, it did take place. I did not see whether it was written or not, but I talked to him and he was in the front seat sitting beside me, and he afterwards asked me wouldn't I cement a wall for him after the trial was over.' Didn't Mr. Hitchcock say that?

"A. No, sir; he said he got on the street car and sat down beside an officer—I think Sergeant McManus, and got into a conversation with him and he showed him—I don't remember the conversation up to that point—but he showed him this statement of Fisher's that had not been used in evidence. In regards to the cementing of the wall, he said, 'If anybody asks you what we were talking about, say I asked you to cement a wall.' "

The contemnor Hitchcock denies all the incriminating parts of the testimony of the four jurors above named. The other jurors who were examined did not refute the testimony of the four jurors above mentioned. I do not understand any of them to mean that Hitchcock did not make the statements attributed to him by Voltz, Jarboe, Dunn and Keen; what they say in substance is that they did not hear Hitchcock makes such statements.

I find from the evidence in this case that the contemnor Hitchcock did make in the jury-room to his fellow-jurors the foregoing statements attributed to him by Jurors Voltz, Jarboe, Dunn and Keen. It is of no importance whether his statements as to the jurors as to what Sergeant McManus had said to him are true or false. It is as much a violation of a juror's duty to impart to his fellow-jurors *false* extraneous information as true extraneous information. In so doing he violated his oath of office that he would well and truly try the issues joined in the matter then depending and a true verdict give according to the evidence.

And he violated the order which I gave to the jury several times during the trial and which he admits that he heard—that the jurors should not discuss this case with anyone and that they should not permit anyone to discuss it with them.

I also find that this violation of duty was wilful and deliberate and that the above-mentioned statements of the contemnor to his fellow-jurors did influence some of them to some extent in arriving at a verdict.

---

The contemnor, George E. Hitchcock, having been brought before the Court as for a contempt, as set forth in the opinion herewith filed and the Court, after considering the testimony and the arguments of counsel, having determined that said Hitchcock is in contempt; it is this 20th day of December, 1921, ordered by the authority of the Criminal Court of Baltimore that the said George E. Hitchcock pay the costs of this proceeding and stand committed to the custody of the warden of the jail of Baltimore City for three months, and that the Sheriff of Baltimore City deliver the body of the said George E. Hitchcock to the said warden, together with a copy of this order, to be furnished by the Clerk of this Court.